## EMPLOYERS' LIABILITY ASSUR. CORPORATION, LIMITED, v. MANNING.

### No. 13605.

Court of Civil Appeals of Texas. Dallas.

April 13, 1945.

Rehearing Denied May 11, 1945.

W. B. Handley, of Dallas, for appellant.

White & Yarborough, of Dallas, for appellee.

YOUNG, Justice.

This is a compensation case, parties hereinafter designated as in the trial court. Plaintiff Manning was an employe of Hap Morse Bowling Alleys, subscriber, and defendant was such employer's compensation insurer. The suit arose by way of plaintiff's appeal from a final award of the Industrial Accident Board; the injuries alleged and developed by the evidence relating only to his right and left legs, defendant interposing general denial. Upon jury trial and verdict in response to special issues, judgment was rendered for plaintiff and against defendant for sums aggregating more than $1,000. In doing so, the court treated findings 5, 6 and 6-a, as entitling plaintiff to compensation for an injury to his left leg at or above the knee.

Summarized and numbered according to issues submitted in the charge, the jury found (1) plaintiff sustained accidental personal injuries on March 10, 1943, whlie working in the course of his employment; (2) such injuries did not result in total incapacity of his left leg; (4) he sustained partial incapacity of left leg as a natural result of the injuries; (5) such partial incapacity in left leg commenced March 10, 1943; (6) partial incapacity in left leg will continue for a period of five years; (6-a) partial incapacity in such leg is 60%; (7) plaintiff did not sustain total incapacity of his right leg as natural result of the injuries; (9) he sustained partial incapacity of right leg as natural result of the injuries; (10) partial incapacity of such leg commenced March 10, 1943; (11) partial incapacity in right leg will continue for a period of one year; (11-a) the partial incapacity in such leg was 50%; (12) plaintiff had not worked in the employment at which he was working at time of injury substantially the whole of the year immediately preceding date of injury; (14) there was not another employe of the same class as plaintiff who had worked substantially the whole of the year immediately preceding March 10, 1943 in the same or similar employment, either in the same or a neighboring place; (16) $20 per week was the average weekly wage of plaintiff which the jury deemed just and fair to both parties.

In due time defendant filed motion to disregard findings 14 and 16 because without support in the evidence; and as a consequence, plaintiff's right of recovery should be predicated upon the minimum compensation provided by law, viz.: $7 per week. Insurer further moved the court to construe finding 6 as legally effective only for 125 weeks from date of injury, because the uncontroverted evidence showed that the partial incapacity in plaintiff's left leg was confined to that portion of the limb below the knee; in other words, as establishing a foot instead of a leg injury. Above comprise the gist of appellant's thirteen points, additional to the contention that all jury answers to issues 4, 5, 6 and 6-a (relating to the left leg), also 14 and 16, are against the great weight and preponderance of the evidence.

It will be noted that the portion of plaintiff's right leg affected by the injuries is not material here, since the jury found partial disability to that member has continued for only one year (52 weeks); but the jury finding of five-year duration of disability to the left leg was reduced by the court to 200 weeks, allowing compensation as for loss of a lower limb or loss of use thereof; Art. 8306, Sec. 12.

Tony Manning, aged 60, a resident of Waco some fifteen years, came to Dallas February 1943; went down to the particular bowling alley on the evening of March 10, and applied for a job. He had never been in a bowling alley before, no experience in setting pins, but was hired for such work. His duties were to set the pins and then move to a side rail, keeping feet out of the way as the ball came down. Later in the evening a rolling ball caught him in the runway setting pins, knocking him off his feet, the ball striking left leg, pins hitting both legs. He stayed on until closing time, didn't feel like going back the next night, but went anyhow, doing similar work, when he quit on account of claimed injuries. There was no hourly or daily wage scale for the job of setting pins; the compensation being figured on a percentage basis,

270

dependent upon games played; or, in plaintiff's words, "If you don't set no pins, you don't get no pay." He testified to working about four hours each of the evenings and was paid around $6. In May 1943, plaintiff started to a training school on Ross Avenue preparatory to employment with North American Aviation, where he later worked at 60 cents per hour, then 80 cents, until sometime in November when he had to check out, again claiming inability to stand on feet. Some weeks he would work 54, 60 or 72 hours for North American, getting time-and-a-half for all hours over 40.

At Waco prior to February 1943, plaintiff did market work, getting 25 to 30 cents per hour for an eight to ten hour day; his last employment being at Plaza Fish Market, drawing $21 per week.

Several other pin setters were working at the bowling alley while plaintiff was there, but he did not know their names. We quote further pertinent testimony of plaintiff at the trial (March 1944):

"Q. Did you do any bowling alley work for as much as three hundred days or close to or near three hundred days in the year before you were injured, working for Hap Morse? A. No sir, March 10th and 11th are the only two days I was ever in the bowling work.

"Q. And you were not regularly employed by any other concern? A. No sir.

"Q. Doing similar work in the year immediately preceding before this injury? A. No. sir.

"Q. Do you know anybody in Dallas County or the neighboring vicinity who was doing any type of similar work who worked as much as three hundred days a year preceding the date of your injury? A. No, I don't. * * *

"Q. When you moved up here to Dallas from Waco did you know what bowling alleys were in the City of Dallas? A. I never heard of any bowing alleys before in my life until I went into that one.

"Q. When you came to Dallas you didn't know what bowling alleys were here? A. I didn't know what bowling alleys were here.

"Q. And you didn't know what alleys were operating? A. No sir.

"Q. And you went over to Hap Morse's place on Young Street and got a job? A. Yes sir.

"Q. But you didn't know how long that alley had been down there operating, did you? A. No sir.

"Q. Did you know whether they had been operating as long as five years or not? A. No sir, I couldn't tell whether it had been operating thirty days before that.

"Q. Or one year, or three years, or any other time? A. I couldn't tell you anything about it."

■ Defendant offered no testimony bearing on "average weekly wages" (Art. 8309, Sec. 1, subs. 2 and 3), and apparently there was no real controversy in the trial court relative thereto. We overrule appellant's contention that above testimony is insufficient to raise the issue of applicability of subdivision 3. Where, as here, this fact question does not appear seriously contested, cases uniformly hold that slight evidence is sufficient to discharge plaintiff's negative burden in such regard. Negative testimony under proper circumstances has probative force. 17 T. J., Sections 120, 408, pp. 358 and 906; Sloan v. Sloan, Tex. Civ.App., 32 S.W.2d 513; Dixon v. Texas & P. R. Co., Tex.Civ.App., 164 S.W.2d 252, writ refused. In Traders & General Ins. Co. v. Crouch, Tex.Civ.App., 113 S. W.2d 650, 654, Syl. 6, similar evidence being elicited from witnesses, the court held: "There was no effort made by appellant to disprove what these witnesses had said, and from the nature of the facts to be established we think the testimony offered was sufficient to support the presumptive finding of the court that the fact was established. Article 2190, Rev.Civ.Statutes, as amended, Vernon's Ann.Civ.St., art. 2190; Federal Underwriters Exchange v. Stewart, Tex.Civ.App., 109 S.W.2d 1031, 1033; 23 C.J., p. 27, § 1762. In the Stewart case, last cited, it appears, as in the instant case, that the insurance carrier made no effort to disprove the testimony offered by employee; discussing the sufficiency of the proof, the court said: 'It occurs to us that where there is no real controversy over the matter in the trial court, very slight evidence will be sufficient to discharge this burden.'" See also Service Mutual Ins. Co. v. White, Tex.Civ.App., 138 S.W.2d 273; Federal Underwriters Exchange v. Arnold, Tex.Civ.App., 127 S.W.2d 972; Traders & General Ins. Co. v. Huntsman, Tex.Civ.App., 125 S.W.2d 431; Southern Underwriters v. Boswell, Tex.Civ.App., 141 S.W.2d 442, affirmed by Supreme Court, 138 Tex. 255, 158 S.W.2d 280; American

Surety Co. v. Underwood, Tex.Civ.App., 74 S.W.2d 551; Federal Underwriters Exchange v. Porterfield, Tex.Civ.App., 182 S. W.2d 847.

Likewise appellant points to no evidence in support of issue 16, in that the record fails to disclose with any exactness plaintiff's earnings during the year preceding injury. We gather from the cited cases that amount of earnings over such antecedent period is a proper but not an essential subject of inquiry in the trial court. Texas Employers' Ins. Ass'n v. Van Pelt, Tex.Civ.App., 68 S.W.2d 514; Traders & General Ins. Co. v. Bulis, 129 Tex. 362, 104 S.W.2d 488; American Surety Co. v. Ritchie, Tex.Civ.App., 182 S.W.2d 501. On the other hand, we think the extreme brevity of plaintiff's employment, the piecemeal nature of his work and wage scale, presents a classic setting for application of Section 3 of the statute. Surely this is a case of "other good and sufficient reasons", and impracticability of computing "average weekly wages" under Sections 1 and 2.

Appellant argues with equal vigor the absence of testimony relative to an injury at or above the left knee; urging that the court erred in refusing to confine the duration thereof to a maximum of 125 weeks as for a below-the-knee (or foot) disability. In view of the pleading, manner of submission and testimony as a whole, we conclude that the construction given by the trial court to finding No. 6 was correct and supports a recovery of compensation for 200 weeks, as for an injury at or above the knee. Plaintiff fully alleged injuries to both right and left leg, and all issues relating thereto were so framed. Defendant's only pleading was a general demurrer and denial, not requesting submission of any issues or. explanatory instructions. No definition of "leg" was given or requested, and it is to be presumed that the jury applied to the issues the meaning contemplated by Art. 8306, Sec. 12, viz.: An injury to said member beginning at or above the knee.

While plaintiff testified that the twelve-pound ball struck his left leg at a point some four to seven inches below the knee-cap and in the shinbone area, directly to be inferred from his whole narrative is that the entire limb was affected. The blow "knocked my feet from under me", ball hitting left leg and pins on both legs; "after the accident happened my legs were dead, it seemed like it was dead for a good while when it began to come to life. I thought the bone was crushed all to pieces the way it hurt and up to now I can stand on my feet a little while and that bone all down there feels like it is going to bust open." Plaintiff spoke of a constant limp in walking, and ease from pain only when "lying down and kind of elevating my feet by night. As long as I am standing on my feet my legs hurt me. If I make a step, it seems like there is a pressure in that bone inside that causes me to limp. I can't help it." He testified to no such trouble before the accident, but of employment difficulties since, because unable to stand on feet; of quitting North American for such reason, also jobs at a grocery store and produce market among others. The jury observed plaintiff's manner of walking, inclusive of visible bruises and discolorations at site of injury; J. B. Manning, brother, stating that he limped badly after March 10, 1943.

Defendant offered no testimony contradictory to that of plaintiff concerning the extent, nature or duration of said injuries. That the blow sustained by plaintiff was actually between knee and ankle is not thereby conclusive of a below-the-knee injury. The only question for our determination is whether, as a result thereof, plaintiff's left leg was affected at or above the knee. Maryland Cas. Co. v. Donnelly, Tex.Civ.App., 50 S.W.2d 388. We conclude that the record is not without testimony bearing upon all of these asserted leg injuries, to which issues the jury gave affirmative answers. In this connection, defendant, by pleading and defensive issues, could have well raised the question of a foot injury alone; in which event plaintiff would have suffered a total defeat, had the jury found adversely on his sole claim of a leg injury. However, insurer did not choose to do so, and, as already stated, we conclude the jury finding of partial incapacity in and to the particular member is substantiated by record testimony, both direct and circumstantial. National Indemnity Underwriters v. Washington, Tex.Civ.App., 119 S.W.2d 1071.

The judgment under review must be affirmed.

BOND, C. J., dissents.

BOND, Chief Justice (dissenting).

The judgment appealed from sets aside the order denying compensation of the Industrial Accident Board, and awards

damages to the employe in the sum of $1,772, payable in weekly installments, for injuries to his "legs", which, interpreted under the statute, Article 8306, Sec. 12, R.S., was for injuries to his legs above the knee; whilst the uncontroverted evidence from plaintiff himself is that all injuries sustained and afterwards suffered were to his limbs "below the knee"—denominated by the statute, supra, his "feet"—a statutory misnomer of the lower terminal part of his legs. It could hardly be doubted that had the injured employe, unfamiliar with the statutory denomination of a "foot" as extending from the ankle to the knee and the "leg" as extending from the knee to the hip, been asked if he received injuries to his "feet", without instruction as to its statutory meaning, that with his knowledge of its meaning he would consistently have answered "No"; so, also, the jury, with no guide or instruction from the court as to what was meant in the special issues submitted as to injuries sustained to employe's right and left "legs", naturally would have answered (as they did answer) that his "legs" were injured, irrespective of evidence showing conclusively that he sustained injuries only to his "feet" or "foot" as denominated by the statute.

It is well known, and manifestly not otherwise, that a man's legs are usually covered with garments—trousers or pantaloons, his feet with shoes and socks; and that the ordinary and accepted designation of "foot" or "feet" of a human being is that part of his body structure below the ankle, and "leg" or "legs" above the ankle. Indeed it would be a dramatic spectacle for a man to wear trousers or pantaloons on his "feet" and shoes and socks on his "legs". Illustrative of the undoubted meaning of the term as interpreted by plaintiff and jury: Plaintiff was asked by his attorney to demonstrate his injuries by raising his trousers up on his legs; and, recognizing the ordinary meaning of "legs", he pulled his trousers up to his knees and pointed out his hurt to the jury. Thus it must be reasonably said that the attorney and his client were not talking about statutory "legs" or "feet"; and, in the absence of instruction from the court as to what is meant in the charge, it may well be said that the court also applied the meaning in its usual and ordinary sense. Manifestly, had the jury been asked whether plaintiff was injured in his "foot" or "feet"—without knowing or having instruc-tion from the court as to the meaning under Workmen's Compensation Law, it undoubtedly would have given it the usual and ordinary meaning, and would have answered that he suffered no injury to his foot or feet. Clearly, such issue, without instruction, would have been unfair to the injured employe, justifying the court to set aside the jury verdict, or interpret it in the light of the evidence as applying to the part of the "foot" that was injured; so, too, where the court asked the jury whether the employe was injured on the "leg", without instruction as to the limitation placed thereon by statute, the jury naturally gave the term "leg" the meaning usually and ordinarily understood. It could hardly be said that the jury gave a strained, unusual meaning to the word "leg" as only extending above the knee, or would have understood the term "foot" as extending from the knee to the actual foot. Under all facts in evidence, it was the duty of the trial court to give in charge the limitation of the term "leg" or "legs" in order to make the special issues relative to the employe's limb-injuries conform to the proof. The charge was so confusing as to give rise to a miscarriage of the facts. Ordinarily, under Rule 279 promulgated by the Supreme Court, where the controlling issues made by pleadings and evidence are submitted upon special issues, failure to submit a definition or explanatory instruction shall not be deemed a ground for reversal of the judgment unless a substantial corrected instruction has been tendered by the complaining party. This Rule has no application here. The defendant was not compelled to object to the charge or submit a definition or explanatory instruction on issues submitted outside of the evidence. It could reasonably have relied upon the court to give the meaning, either in the charge or interpretation of the verdict in light of the evidence. The verdict of the jury is meaningless, unless it be given such interpretation; the jury evidently applying the term "leg-injury" to that part of plaintiff's walking appendages which the evidence shows was actually hurt, and not to the part which was not involved—upper part of the legs above the knee.

It will be noted that the portion of plaintiff's right leg, or statutory foot, affected by the injury is not material here, as related by the majority, since the jury found partial disability to that member would con-

tinue only for one year (52 weeks), which is within the statutory limitation for injury to the "foot"; so the verdict would not affect the period of disability to that leg or "foot",—whether the meaning of the term "leg" be given to the upper or lower portion of the limb. But as to the jury's finding of "five-year" injury duration of disability in the left leg (reduced by the court to 200 weeks, allowing compensation therefor as for injuries to left leg at or above the knee), appellant's point of error is material and vital to a fair conclusion, justifying a judgment reduction by this court in the amount of recovery to 125 weeks instead of 200 weeks, or reversal of the cause.

Without drawing conclusions as to the evidence affecting appellant's point of error, as was done by the majority, it is well that the entire testimony on the involved issue be quoted literally:

Mr. Tony Manning testified:

"Q. * * * Will you raise your trouser's leg? You have got your left trouser's leg up? A. Yes, sir.

"Q. Will you point out to the jury and show the jury where the balls and pins hit you? A. The ball hit me right there. It is still sore.

"Q. Wait just a minute before you move. You have pointed there to a place approximately six or seven inches below your knee cap on your right shin? A. Yes sir.

"Q. I am getting that for the record because otherwise we don't have a description of where you are pointing, in the record. Now, what is noticeable? Will you describe what is noticeable at the place you pointed out so it will be in the record, so the court reporter can put it in the record? A. There is where the pin hit me.

"Q. You are on another place. Let's go back where you were at first? A. There is where the ball hit me on that bone.

"Q. What is showing there now? What do you see there? A. It is still sore yet.

"Q. Is the color there at that place just like the rest of your leg? A. No, sir, you can tell it is not like the rest of my leg.

"Q. I want you to tell what it is so the court reporter can put it down on paper. A. That is a bruised place.

"Q. What color is it? A. It is rather dark color as well as I can see. It is a dark reddish color.

"Q. You say there is an area there that is tender? A. Yes, sir.

"Q. Will you show the jury the extent of that area that is tender? A. Well, from right along here up to about here on the edge of that bone it is just like a rising.

"Q. You have bounded an area about two inches below and about two inches above the scar? A. Yes, sir; the edge of that bone is like a rising.

"Q. State whether or not that coloration, that place was on there that you indicated before this accident happened at Hap Morris' bowling alley? A. No, sir, it wasn't.

"Q. State whether or not you had that soreness and pain in there before that accident at Hap Morris' bowling alley? A. I never had any pain or soreness in there in my life.

"Q. Has that been continuously since then? A. Ever since; I can hardly stand it.

"Q. Now, point out any other place on that left leg other than the one you have just described and pointed out? A. That is where a pin hit me there and one right there.

"Q. Now then, in the first place, rather the second place you have pointed out, that is a place approximately four inches from your knee cap over to the right on the inside portion of your leg toward the front, is that right? A. Yes, sir.

"Q. A dark spot there? A. Yes, sir.

"Q. Describe what the feeling, if any, was in that after the accident happened? A. Well, after the accident happened my legs were dead, it seemed like it was dead for a good while when it began to come to life. I thought the bone was crushed all to pieces the way it hurt and up to now I can stand on my feet a little while and that bone all down there feels like it is going to bust open.

"Q. The spot on the right, is there any soreness in that at the present time? A. Lots of times during the day it feels like it is going through my leg.

"Q. Was that condition existent in your leg before March 10, 1943, that one you have just described? A. The needles?

"Q. Yes, sir. A. I had some very small varicose veins but nothing up here.

"Q. Had you had trouble with varicose veins where they interfered with your work? A. No, sir.

"Q. It wasn't troubling you to such an extent you couldn't stand on your feet? A. No, sir, they never troubled me at all.

"Q. Are there any other places now that are visible on your left leg where the balls hit you? A. I notice them places being blue. Of course, I was hit all over my leg with pins and hit on the right leg.

"Q. What about the place down there above your sock. Was that there before? A. No, this place here wasn't there.

"Q. Is there a discoloration there, that is about three inches above your ankle on the shin bone? A. Yes, sir.

"Q. Is there a discoloration or dark place there? A. Yes, sir.

"Q. Was that there before this accident? A. It was not.

"Q. Has it been there ever since? A. Yes, sir.

"Q. Is there any soreness in there yet? A. Well, just to tell you the truth about it, from my ankle on in here it pains all the time but it hurts worse in here than anywhere. It seems like it is bruised on that bone from the way I stand on my feet a while.

"Q. There has been an improvement in the lower part? A. Yes, sir, down in the lower part it doesn't hurt me so bad, but the worst pain I have is right in here.

"Q. And that is about six inches below the knee cap on the shin bone? A. Yes, sir.

"Q. Will you show the jury your right leg and if there is any difference in it now and the way it was before this accident happened, point out what changes there have been? A. There is quite a change in that leg.

"Q. Tell what it is. A. Like I told you a while ago, I had some very fine varicose veins running down in here. After the pin hit me on this leg here, I don't know how many hit me on that leg, to be honest about hitting me, but there was three very bad black spots after it was done.

"Q. Show the jury where the black spots were. A. One right here at the edge of my slipper.

"Q. You are now at your ankle on the right side? A. Yes, sir.

"Q. That is about two inches in front of your ankle on the outside? A. Yes, sir.

"Q. Is that sore? A. It isn't sore there but it is pretty sore in here but nothing compared to the left leg. The left leg is the one that gives me so much trouble.

"Q. Did you have soreness in that right leg before the accident? A. No, sir.

"Q. Have you had some soreness in it at all times since this accident? A. Oh, well, I have soreness in that ever since it happened but it doesn't hurt me now like my left leg did and does now.

"Q. Did you have any limp before this accident happened? A. No, sir, I didn't.

"Q. State whether or not you have had a limp since this accident? A. I can't help but limp now. I can hardly walk without limping at all.

"Q. Is there any time you can walk with no limp or limp that is hardly noticeable? A. No sir, there isn't but one time I can get any ease on my leg and that is when I am laying down and kind of elevating my feet at night. As long as I am standing on my feet my legs hurt me. If I make a step, it seems like there is a pressure in that bone inside that causes me to limp. I can't help it.

"Q. Has there been any improvement say in the last six or eight months in that left leg so far as the pain is concerned? A. No, sir, not in the left leg."

The courts have been generous in giving liberal interpretation to the compensation law and have construed testimony favorably to the injured employe when possible to do so without violence to the plain language of the statute, its import, and the uncontroversial testimony. That is as should be done. A review of the above testimony discloses injuries below the knee in each leg. The demonstration of the injured employe in pulling up his trousers and describing the places on his legs where he was hit by the ball and pins, indicates that he, in using the word "leg", was referring to that part of the limb between knee and ankle. In testifying (during this demonstration) about his left leg, he pointed to places four, six and seven inches below the knee-cap and on the shin, relating in detail the pain suffered at those places, and no others. There is no testimony remotely suggesting injury to either leg "at or above the knee."

The Compensation Act, Article 8306, Sec. 12, divides the lower limb of a workman into two segments: First, the leg "at or above the knee" for which 60% of the average weekly wages for 200 weeks is allowed; second, the "foot" designated as below the knee, for which 60% of the average weekly wages for 125 weeks is allowed. Thus appellant timely objected to the submission of the involved issue upon the ground above indicated, and assigns error here that there is no evidence showing injury to the left lower limb of appellant's body at or above the knee. The trial court was thus given ample opportunity to correctly submit a controlling issue made by the pleadings and evidence as to have the jury find correctly the part of the legs affected. The objection apparently was ignored, leaving the issue in a nebulous state, justifying a right and just interpretation of the jury's verdict. The jury was indeed generous in awarding five-year disability for injuries to the employe's left leg; and the trial court's reduction to 200 weeks and award of $1,772 damages for bruises—no bones broken, no skin lacerated and no flesh torn—justifies a close consideration of this record. Plaintiff offered no medical testimony; the case rests exclusively on his testimony and that of his son and brother.

Another involved question is presented that challenges the judgment of the trial court and the majority's affirmance of the judgment. Appellant's objections in the trial court and its assignments and points of error in this appeal, present that there is no evidence for the trial court to submit issues 14 and 16, hence the court's judgment on the jury's verdict calculating appellee's average weekly wages under subd. 3, Sec. 1, Art. 8309 of the Workmen's Compensation Law, finds no support in the evidence. The Article provides: "When by reason of the shortness of the time of the employment of the employe, or other employe engaged in the same class of work in the manner and for the length of time specified in the above subsections 1 and 2, or other good and sufficient reasons it is impracticable to compute the average weekly wages as above defined, it shall be computed by the board in any manner which may seem just and fair to both parties." In rendering judgment, the trial court used as a basis the average weekly wages of $20 found by the jury, thus arriving at a compensation basic rate of $12 per week.

It is a recognized rule that the burden is upon plaintiff to offer evidence showing, at least, prima facie that the injured employe and no other employe doing the same or similar work in the same community had worked for substantially a year next preceding the date of the employe's injury, before subsection 3 shall have application. The burden never shifts to the defendant to make out a prima facie case for the plaintiff. Hence where there is no evidence affecting subsections 1 and 2, the average weekly wage prescribed by law (Sec. 10, Art. 8306) as the basis for compensation, is $7.00 per week. Texas Employers' Ins. Ass'n v. Lightfoot, 139 Tex. 304, 162 S.W.2d 929. In the case at bar it is admitted that the injured employe did not work for substantially the whole of the year immediately preceding his injury in the same employment in which he was working at time of his injury; and plaintiff offered no evidence showing prima facie or otherwise that there was no other employe of the same class as he who had worked substantially the whole of the year in the same or a neighboring place, and he made no effort to secure such evidence. Thus, in the absence of such proof, the defendant was not called upon to rebut a presumption of a material fact. The verdict of the jury and the judgment of the court in computing the weekly wages "in any manner which may seem just and fair to both parties" in absence of proof was not authorized. The liberality of the rule in construing testimony favorably to an injured employe does not go to the extent of supplying necessary proof to sustain a judgment. In all authorities cited by appellee to sustain the action of the court, some evidence appears calling upon defendant to disprove the presumption of fact in favor of the employe; but no authority cited holds that the defendant must supply proof to refute a fact which the statute requires plaintiff to prove. Court should not abrogate a statute to reach a conclusion in absence of facts required of the injured employe to affirmatively show.

In view of the record, the judgment of the trial court should be reformed so as to allow the plaintiff a 50% partial disability in his right leg or "foot" on the compensation minimum basis of $7 per week for 52 weeks, payable weekly, as found by the jury; and, also compensation at the rate of $4.20 per week, being 60% of partial disability to his left leg or "foot", for 125

weeks, payable weekly; and, as reformed, the judgment be affirmed; one-third of the recovery payable to White and Yarborough, attorneys for appellee.

I respectfully dissent from the majority.